FILED
2014 Jul-17  PM 01:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SYLVIA L. CLAYTON, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | CIVIL ACTION NO. |
| | } | 2:12-cv-4013-WMA |
| GOLDEN BIRD ACQUISITION, LLC, | } | |
| D/B/A KRYSTAL, | } | |
| | } | |
| Defendant. | } | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Sylvia L. Clayton brings this Title VII action against defendant Golden Bird Acquisition, LLC, d/b/a Krystal, alleging discrimination based on race.  Before the court is defendant's motion for summary judgment.  For the reasons that follow, defendant's motion will be denied.

**Background**

Defendant is a fast food restaurant chain.  Plaintiff is a black woman.  From December, 2009, until July, 2013, plaintiff worked as a cashier at one of defendant's stores.  During the course of her employment, she sought promotion to the position of "Master Cashier."  Defendant took several steps toward awarding her the promotion, even giving her a Master Cashier work uniform, but never increased her pay.  Plaintiff insists that she was unlawfully denied promotion, or, alternatively, that she was promoted but unlawfully denied pay equal to that of other Master Cashiers.

Defendant's motion for summary judgment has been fully

1

briefed.   Defendant has also made two motions to strike certain
evidence upon which plaintiff relies in her opposition memorandum,
on the grounds that the evidence is irrelevant under Title VII case
law or will be otherwise inadmissible at trial.   Because the court
is convinced that a trial judge can accord this evidence the proper
weight without "striking" it from the record, the motions to strike
will be denied, without prejudice to any later motion in limine or
objection to the evidence at trial.

What remains are the merits of plaintiff's race discrimination
claim.   The facts that gave rise to this claim are these:

**Krystal and the "Master Cashier" Position**

Defendant's Trussville location (and all Krystal stores?) had
until 2012 a position called "Master Cashier."   A Master Cashier
performed all the duties of a regular cashier, but was supposed to
be more expert and more pleasant to customers, wore a different
color shirt, and made slightly more money.   The process for
becoming a Master Cashier was mostly informal.   The employee did
not fill out any application or the like, but merely expressed
interest to the store manager.   Afterward, and with the manager's
guidance or instruction, the employee was required to complete a
certain number of "Web-Based-Training modules" and to ace a "Master
Cashier Test."   Meanwhile, the store manager would communicate the
employee's request to the "franchise corporate office," which in

2

turn would recommend the employee to the "franchise standards representative." The franchise standards representative would take the final step of certifying the employee as a Master Cashier.

The promotion process thus required succesfully passing four evaluation steps: (1) the General Manager, (2) the trainings/test, (3) the "franchise corporate office," and (4) the "franchise standards representative." Any of these steps could conceivably have been tainted by the prohibited influence of racial animus. Further complicating matters is that defendant's power structure was somewhat unsettled during plaintiff's tenure, and at least three different people held the General Manager position over plaintiff. Plaintiff does not pin down the exact spot or spots where discriminatory intent crept into the hiring process, but relies on the logical inference that it must have been somewhere in the following course of events:

**The Bascoe Months: December 2009 - March 2011**

When plaintiff was first hired, in December, 2009, defendant was in the midst of apparent management upheaval, and nobody officially held the "General Manager" title. Nevertheless, an "Assistant General Manager," Ann Bascoe, acted as general manager, and plaintiff claims that it was to Bascoe that she first voiced her desire for the Master Cashier position. According to plaintiff, Bascoe reacted favorably to plaintiff's request and set

in motion the promotion machinery.  Shortly after the request was made, Keith Moody, the franchise standards representative, came to observe and evaluate plaintiff and Kelly Lawrence, another cashier and promotion candidate.  After this evaluation, plaintiff testifies that a "District Manager," Sheryl Perlstein, told her, informally, that she had been certified as a Master Cashier.

Defendant's version of what happened during this time period is different.  It denies that plaintiff ever expressed interest in the Master Cashier position during the Bascoe months, and denies that Moody ever evaluated plaintiff.  Moody himself testifies that he has no record or recollection of ever observing plaintiff, and that his visit to the Trussville location was made only to observe Lawrence.  This testimony is inconsistent with the testimony of Lawrence and a few other coworkers, who were under the impression that Lawrence and plaintiff were both being observed.  Defendant insists that this testimony will not be admissible at trial.

Whichever version of these months is correct, it is undisputed that Lawrence was officially promoted to Master Cashier in February, 2011, and plaintiff was not.

**The Moore Months: March 2011 - September 2011**

In March, 2011, Bascoe was replaced by Ray Moore, a full-blooded "General Manager."  Plaintiff claims that, as soon as Moore was hired, she repeated her request for a promotion to him.  She

testifies that Moore confirmed what Perlstein had said earlier, namely, that plaintiff had been certified as a Master Cashier and would soon be officially promoted.  She further testifies that, when she later asked what the status of the promotion was, Moore told her that he was working on it.

Defendant again has a different story.  It says that Moore never communicated that he would promote plaintiff, and indeed that he never had any intention or inclination to do so.  Moore testifies that plaintiff was not much of an employee: "she wouldn't dress appropriate, she wasn't good with the customers, and she just--I wouldn't have recommended her for a master cashier personally."  Moore Dep., Def.'s Ex. F, at 35-36.  In fact, he says that he came close to firing her on a few occasions, and that only pity for her difficult financial situation moved him to keep her on board.

A jury might choose to take Moore's testimony with a grain of salt.  In September, 2011, just six months after he was hired, Moore was caught embezzling money from the company and was fired.  His testimony that plaintiff was a lousy employee is not supported elsewhere in the record.  The opinions of plaintiff's coworkers and other supervisors, for whatever they are worth, were that plaintiff was diligent and responsible.

A mysterious endnote to Moore's tenure is that, just after he

was fired, plaintiff received an official Master Cashier work
shirt.  The Master Cashier shirts are a different color from the
normal cashier shirts, and are specially embroidered with the
employee's name: here, a nice, cursive "Sylvia."  *See* Pl.'s Ex. 7.
The shirt was delivered to plaintiff by a fellow cashier.  Neither
plaintiff nor defendant can explain where the shirt came from.
Could it be that Moore, with his last gasp, heroically came through
with the promised promotion?  Was Perlstein right when, months
earlier, during the Bascoe months, she told plaintiff that
plaintiff had been certified by the powers that be?  Was the shirt
ordered then, and for some reason took several months to be
delivered?  The mystery remains unsolved.  Whatever the case, the
Master Cashier shirt was never accompanied by a Master Cashier
title and, more importantly, was never accompanied by a Master
Cashier pay raise.

**The Allison Months: November 2011 - July 2013**

After Moore's unexpected departure, defendant hired Scott
Allison, another full-time General Manager.  For a third time,
plaintiff expressed that she wanted to be officially granted the
Master Cashier position.  She now expressed additionally that she
felt she was already entitled to it.  Plaintiff says that Allison,
like Moore, told her that he was "working on" getting her the
promotion.  Allison denies this, but does confirm that he was well

aware of plaintiff's interest in the position, as well as the facts that plaintiff had expressed interest during the previous regime and had already received a shirt for it.  But Allison says he never had any intention of giving plaintiff the promotion.  As he explains, "[t]hey were dissolving the master cashier position, so I didn't consider [promoting plaintiff] or think about it."  Allison Dep., Def.'s Ex. D, at 71.  He did, however, consider at least one cashier for promotion.  Sarah Blalock, a white cashier, has testified that she was chosen by Allison to become a Master Cashier and was evaluated for the position by Moody, but left the company just before receiving the promotion for unrelated reasons.  Blalock Dep., Pl.'s Ex. 1, at 15-16.

Allison also rankled plaintiff in other ways.  On one occasion, he allegedly shared a racially-charged joke with her.  Plaintiff says that when she asked at the end of a shift whether she was free to go home, Allison responded "Are you free?  I don't know.  Ask Lincoln."  On another occasion, he reprimanded plaintiff for wearing a burgundy hairpiece in violation of a company policy against unnatural hair colors.  Plaintiff did not feel the policy was applied equally against white employees, though defendant has produced some evidence that white employees received similar reprimands.

Plaintiff never received any official promotion from

defendant, and had her pay increased only once, by $0.05 per hour, during her four years with the company.  She left voluntarily in July, 2013, for a job at Sonic, a rival fastfood chain.

**Discussion**

Plaintiff's case is based on circumstantial evidence of discrimination, and thus is analyzed according to the tired and sometimes tiresome burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  First, the complainant "must carry the initial burden under the statute of establishing a prima facie case of racial discrimination"; second, the burden "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection"; and finally, the complainant must show that the employer's "stated reason for respondent's rejection was in fact pretext."  *Id.* at 802-04.

**1.  Prima Facie Case**

To establish a prima facie case of discrimination in defendant's promotion decisions,[1] plaintiff must show "(1) that the plaintiff belongs to a protected class; (2) that she applied for and was qualified for a promotion; (3) that she was rejected despite her qualifications; and (4) that other equally or

---

[1]It is not important to distinguish plaintiff's "disparate pay" claim from her "failure-to-promote" claim.  Whether plaintiff is said to have been unlawfully denied a promotion, or said to have been granted a promotion but unlawfully denied an appropriate pay increase, the analysis is essentially the same.

less-qualified employees outside her class were promoted." *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010) (citation omitted).  These elements are met with the following evidence: (1) plaintiff is black, and thus a member of a protected class, Pl.'s Facts ¶ 1; (2) she applied for a job as a Master Cashier by expressing interest in it to her supervisors, *id.* ¶¶ 4, 34, 54; and completed the required trainings and tests and was a competent employee, *id.* ¶¶ 40-43, 62-65, 68; (3) she was never promoted; and (4) several white employees, including Kelly Lawrence and Sarah Blalock, were chosen for the promotion that she sought, *id.* ¶¶ 27, 59.

### 2. Legitimate, Non-Discriminatory Reason

Defendant meets its initial burden as well.  It offers several non-discriminatory reasons for its decision to leave plaintiff as a regular cashier throughout her employment.  During the Bascoe months, defendant says, plaintiff had not yet applied for the position, or at least, her interest in the position never reached the ears of Keith Moody, the certifying manager.  Def.'s Facts ¶¶ 48-55.  During the Moore months, plaintiff was not qualified because Moore, the hiring decision-maker, felt that she had inappropriate attire, a poor attitude, and a rude demeanor toward customers.  Def.'s Mem. at 18-19.  Regardless of these reasons, or in addition to them, plaintiff was unqualified during both the

Bascoe and Moore months because, according to defendant's records, she did not complete the required training courses until January, 2012. Def.'s Reply at 15. Finally, by the time the Allison months rolled around, the company was in financial turmoil, and for that reason nobody was or could have been promoted. *Id.*

### 3. Pretext

The final, and most important, step of the inquiry is a determination of whether defendant's proffered explanation is pretextual. On defendant's motion for summary judgment, plaintiff must present "sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Crucially, the question of whether the employer was motivated by plaintiff's race involves peeking into the mind of the decision-maker, a task which only a jury can undertake. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) ("[After the parties meet their initial burdens,] **the trier of fact** proceeds to decide the ultimate question.") (emphasis added).

Frankly, both parties' cases are fragile when subjected to the closer inspection of step three of *McDonnell Douglas*. Plaintiff,

10

for her part, has made a strong case that defendant's failure to promote her was callous, blundering, and even dishonest, but has presented little evidence that race had anything to do with it. The entirety of her evidence with direct relation to race is one garden-variety racist joke made by Allison, and one instance of verbal discipline, unaccompanied by punishment of any kind, for wearing a hairpiece that violated company policy.  Even assuming that these were examples of unequal treatment based on race (and the evidence is at best mixed as to the latter incident), these incidents were isolated, not pervasive.  Furthermore, if defendant discriminated based on race, it did so inconsistently.  Two of the three supervising general managers, Bascoe and Moore, were the same race as plaintiff.  So too was one of plaintiff's co-cashiers, Tellisa Heard, who received the promotion that plaintiff desired. Pl.'s Facts ¶ 46-47.  And so too were managers elsewhere in the company, including Jacqueline Hearns, the General Manager that succeeded Allison, Pl.'s Facts ¶ 73, and Jacqueline McClellan, one of plaintiff's trainers/shift managers, Pl.'s Facts ¶¶ 36-37.

Plaintiff's lack of affirmative evidence, however, is not fatal to her case.  "[I]t is *permissible* [though not mandatory] for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000) (emphasis in

original) (qualifier added for context); *see also Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (plaintiff can prevail by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence") (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).  So, plaintiff can rest her case entirely on the inadequacy of defendant's explanation, rather than the adequacy of her own.  Defendant has certainly provided her the opportunity to do so.  The claim that plaintiff never expressed interest in the position during the Bascoe months is inconsistent with plaintiff's testimony and with the corroborating testimony of some of plaintiff's coworkers.  The claim that Moore considered plaintiff an undeserving employee is based solely on the post hoc testimony of Moore, a witness of dubious credibility, and is undermined by other evidence, including abundant evidence that plaintiff's work performance was conspicuously good and evidence that Moore expressed optimism about her promotion throughout his tenure.  The claim that plaintiff did not complete the required trainings until 2012 and thus could not have been promoted before that time is undermined by the overall informality of the promotion process, the fact that other employees were apparently promoted without having

12

completed all the required courses, and the fact that a Master Cashier shirt was produced for plaintiff, despite the incomplete trainings, in 2011.  The claim that the company did not and could not, because of financial hardship, promote anybody during the Allison months is significantly undermined by the fact that Allison selected, and the company approved, the promotion of Blalock in early 2012.  Substantial evidence thus exists on which a jury could, though not must, disbelieve all of defendant's proffered explanations.

Furthermore, defendant's presentation of facts throughout the litigation process has tended toward exaggeration--a tendency which a jury may very well view unfavorably.  In proceedings before the Equal Employment Opportunity Commission ("EEOC"), defendant explained that Allison "stutters in the early morning hours due to exhaustion," and that this probably caused plaintiff to hear an "ask Lincoln" joke where none was actually uttered.  *See* Pl.'s Mem., Ex. 15, at 2.  This would-be explanation is dubious, at best, as well as somewhat misleading.  There is some testimony that Allison sometimes "mumbles," but he does not have and has never had a problem with "stuttering," *see* Allison Dep., Def.'s Ex. D, at 170, and there is no evidence that anybody has ever had trouble understanding Allison's speech, *see, e.g.*, Stephenson Dep., Def.'s Ex. E, at 202 ("Q.  Does Scott Allison stutter?  Have you ever

13

known him to stutter?  A.  No, ma'am.").  Nor is it likely that
plaintiff misheard Allison.  While defendant originally claimed
that plaintiff and Allison were the only two people present when
the comment was made, defendant has since admitted that Jacqueline
McClellan, a Shift Manager, was also present.  *See id.* at 199-200.
McClellan not only understood Allison to say "ask Lincoln," but
filed her own, separate EEOC complaint about the comment.  Pl.'s
Mem. at 39.

Elsewhere in its correspondence with the EEOC, defendant's
factual postulates are similarly outlandish.  In one paragraph,
defendant bravely announces that plaintiff "cannot demonstrate she
began or expressed an interest in the master cashier program," that
"Mr. Allison had no knowledge Ms. Clayton took the web-based
training classes or completed her master cashier training program,"
and that "no evidence exists [that] Ms. Clayton ever applied with
Mr. Allison's predecessor [Moore]."  Pl.'s Mem., Ex. 15, at 3-4.
In sum, "Ms. Clayton never asked to go through the program or
indicated any interest in it."  *Id.* at 4.  These statements venture
beyond aggressive advocacy and into the realm of blatant untruth.
The record is clear that plaintiff expressed interest in the Master
Cashier position early and often, to just about anyone who would
listen.  Both Allison and Moore have specifically and unequivocally
testified that they were aware of her interest in the position.

*See* Allison Dep., Def.'s Ex. D, at 62; Moore Dep., Def.'s Ex. F, at 84.

Defendant's fast-and-loose treatment of the facts continues in its briefs before this court.  In an effort to emphasize the significance of the fact that Moore is the same race as plaintiff, for example, defendant claims that "[t]he only promotions to Master Cashier occurred while Ray Moore served as the Gen[e]ral Manager." Def.'s Mem. at 18.  This is probably inaccurate.  Defendant's own records show that the pay raise for Lawrence was approved in February, 2011, one month before Moore arrived. *See* Pl.'s Ex. 10. Nevertheless, defendant doubles down on the next page, claiming that Moore's successor, "Mr. Allison[,] never considered **anyone** for promotion to Master Cashier."  Def.'s Mem. at 19 (emphasis in original).  The court ought to coin a new legal Latinism to capture the phenomenon that the more emphasis is placed on text, the less likely the text is to be true.  The maxim would apply here; if former Krystal employee Sarah Blalock is believed, Allison not only considered **someone** for the Master Cashier position, but selected the person he considered and went through the full promotion process with her. *See* Blalock Dep., Pl.'s Ex. 1, at 15-16.  The only reason that Allison never actually "promoted" anyone is that the selected person chose to decline the promotion, at the last second, for medical reasons.

15

In sum, the evidence in this case is widely disputed, and there is considerable room for disagreement as to the degree of truthfulness of defendant's proffered reasons for its hiring decisions, as well as the degree any untruthfulness is relevant to and/or probative of the ultimate issue of discriminatory intent. These are ambiguities that can only be resolved by the jury.

**Conclusion**

For all the foregoing reasons, the court concludes that this matter contains genuine disputes as to material facts, so that defendant is not entitled to judgment as a matter of law. Defendant's motion for summary judgment (Doc. 14) is therefore DENIED. Defendant's motions to strike (Docs. 23-24) are also DENIED.

Unless the parties notify the court that they have made arrangements to settle the case or to participate in alternative dispute resolution, a pretrial conference shall be held, in chambers, on **August 1, 2014, at 10:30 a.m.** A court reporter shall be present. The court strongly encourages the parties to consider settlement.

DONE this day 17th day of July, 2014.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

16